JoNes, Chief Judge,
dissenting:
I cannot agree to the conclusion reached by the majority.
I think the plaintiff, at all times, had the substantial elements of ownership of the stock in question. When the various provisions of the statutes are considered it becomes manifest that it was the intention of Congress to levy an estate tax on stock in an American corporation owned by an alien on exactly the same basis as stock in the same corporation when held by an American citizen.
True the stock was put up by the English Government as part of the security for a substantial loan during a war emergency, but the act by which it was used specifically provided that the original owner should have the equivalent of all dividends as they might be declared, that he should *803 have either the return of the stock or the value at the time of final disposition and, in effect, that he should retain practically all the indicia of ownership. At any rate, the decedent had the beneficial ownership. The estate had exactly the same value as it would have had if the full legal title and possession had remained at all times in the plaintiff.
If we regard substance rather than form, the stock, the full value of which remained in the decedent at all times, should be treated in law as it was in fact as a part of the estate. Such a conclusion would tax all the owners of the stock on the same basis. Any other conclusion would be unjust.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The City Bank Farmers Trust Company sues as ancillary executor of the estate of Carlos A. Grace, deceased, to recover the sum of $666,762.75 (plus interest), representing the portion of the estate tax that was paid to the defendant in 1947 on behalf of the estate of Carlos A. Grace[1] with respect to 12,951 shares of common stock and 2,126 shares of preferred stock in W. B. Grace & Company.
2. (a) Carlos A. Grace died on March 12, 1946. At the time of his death, he was a citizen and resident of England. (Carlos A. Grace will usually be referred to hereinafter as “the decedent”.)
(b) The National Provincial Bank Limited, of London, England, is executor of the last will and testament of the decedent.
(c) The City Bank Farmers Trust Company, a corporation organized under the laws of the State of New York, is ancillary executor of the estate of the decedent under ancillary letters testamentary granted on June 10, 1947 by the Surrogate’s Court of New York County, New York.
*804 3. W. B. Grace & Company is a corporation organized under the laws of the State of Connecticut and has its principal place of business in the City of New York, New York. The ownership of 4,317 shares of common stock and 2,126 shares of preferred stock in that company was acquired by the decedent about 1910.[2] Prior to 1939, he deposited these securities with Messrs. Coutts & Company, bankers, in London for safekeeping. At the time of the deposit, in accordance with British custom, he endorsed the shares in blank. (These securities are sometimes referred to hereinafter as “the Grace shares”.)
4. In September 1939, the United Kingdom declared war on Germany.
5. On August 24,1939, the British Parliament enacted the Emergency Powers (Defence) Act, 1939,
to confer on His Majesty certain powers which it is expedient that His Majesty should be enabled to exercise in the present emergency; and to make further provision for purposes connected with the defence of the realm.
This act authorized the making of such regulations
as appear to him to be necessary or expedient for securing the public safety, the defence of the realm, the maintenance of public order and the efficient prosecution of any war in which His Majesty may be engaged, and for maintaining supplies and services essential to the life of the community,
and further authorized, among other actions,
the taking of possession or control, on behalf of His Majesty, of any property or undertaking.
6. Kegulations designated as The Defence (Finance) Beg-ulations, 1939, were duly promulgated under the Emergency PowTers (Defence) Act, 1939, by a series of orders beginning August 25, 1939. These regulations provided in part as follows :
1. — (I) The Treasury may by order direct—
*805 (a) that, subject to any exemptions for which provision may be made by the order, no person shall, except with permission granted by or on behalf of the Treasury, sell, transfer or do anything which involves the creation of a charge on, securities of any such class as may be specified in the order, being a class of securities which, in the opinion of the Treasury, are likely to be marketable outside the United Kingdom, and
(5) that the owner of any securities of the said class shall, in such manner and within such period as may be specified in the order, make a return to the Bank of England giving such particulars with respect to those securities as may be so specified.
For the purposes of this paragraph a person who mortgages or pledges a security shall be deemed thereby to create a charge on the security.
(2) At any time while an order made under the preceding paragraph with respect to securities of any class is in force, the Treasury, if they are of the opinion that it is expedient so to do for the purpose of strengthening the financial position of the United Kingdom, may, by an order made generally with respect to any specified securities of that class, or by directions given with respect to any securities of that class of which any particular^ person is. the owner, transfer to themselves the securities to which the order or directions relates or relate, at a price specified in the order or directions being a price which, in the opinion of the Treasury, is not less than the market value of the securities on the date of the making of the order or the giving of the directions * * *.
7. Under Regulation 1 of The Defence (Finance) Regulations, 1939, the British Treasury issued an order dated August 26,1939, known as The Securities (Restrictions and Returns) Order, 1939, which provided in part that:
1. No person being an owner of securities of any of the classes to which this Order applies shall on or after the date of this Order, unless permission has previously been granted by or on behalf of the Treasury, sell transfer or do anything which involves the creation of a charge on any securities of the said classes.
2. The owners of any securities of the said classes shall * * * malee a retwrn to the Bank of England * * * giving the following particulars * * *.
3. The classes of securities to which this Order applies are the following, that is to say,
*806 Securities in respect of which the principal, interest or dividends are payable in the currency of any of the following countries:
Argentina
Belgium
Canada
France
Holland and the Dutch East Indies
Norway
Sweden
Switzerland
United States of America
or in respect of which the holder has an option to require the payment of principal, interest or dividends in the currency of any of those countries. [Emphasis supplied.]
8. Acting as required by The Defence (Finance) Regulations, 1939, Coutts & Company declared to the British Treasury its holding of the Grace shares. Coutts & Company did not consult the decedent in this connection.
9. On June 18,1910, the Bank of England directed a secret communication to Messrs. Coutts & Company, instructing them to hold various securities, including the Grace shares, “at the disposal of H. M. Treasury, as from the date of this letter”. The letter from the Bank of England stated that:
I am to add that H. M. Treasury consider that this matter should be treated with the utmost secrecy and as of a very high degree of urgency.
Accompanying this advice was a detailed instruction on how to pack and ship these securities from their then place of custody to a “Receiving Centre” designated by the Bank of England, delivery to be no later than June 22,1940,
10. In compliance with the instructions mentioned in finding 9, Messrs. Coutts & Company in June 1940, without consulting the decedent or making the fact known to him in any way, delivered the Grace shares to the Bank of England.
11. The Bank of England subsequently shipped the Grace shares to its agency and depositary in Montreal, Canada.
12. On May 22, 1940, the British Parliament passed the Emergency Powers (Defence) Act, 1940, subtitled “An Act *807 to extend the powers wliicli may be exercised by His Majesty under the Emergency Powers (Defence) Act, 1939”.
13. Under the Emergency Powers (Defence) Act, 1940, there was issued on July 17,1940 an Order in Council adding Regulation 1A to The Defence (Finance) Regulations, 1939. Regulation 1A, captioned “Custody and disposition of documents of title to securities”, provided that:
The Treasury may give such directions as to the custody and disposition of documents of title relating to securities, or relating to any class or description of securities specified in the direction, as appear to the Treasury to be expedient.
14. On or about August 3,1940, the British Treasury, acting under the Emergency Powers (Defence) Acts, 1939 and 1940, in a letter to Messrs. Coutts & Company confirmed that
the Lords Commissioners of His Majesty’s Treasury authorized the Bank of England pending the making of the Order in Council of the 17th July, 1940, (S. R. & O. of 1940 No. 1290) amending the Defence (Finance) Regulations, to arrange with you for the collection and delivery of certain securities held by you.
15. The Grace shares, endorsed in blank, remained in the United Kingdom Security Deposit in Montreal until 1941. They were not listed on any exchange.
16. On July 21,1941, the Government of the United Kingdom of Great Britain and Northern Ireland entered into a loan agreement with the Reconstruction Finance Corporation for a loan of approximately $425,000,000 to be made by the Reconstruction Finance Corporation to the British Government. The loan was to bear interest at the rate of 3 percent and was to be repaid by July 1,1956, but the agreement contained a provision for a possible extension of the loan for five additional years. It was to be secured by the pledge of collateral, consisting of the securities of American companies listed in schedules annexed to the loan agreement. One of the schedules was denominated Schedule B-3; and it was comprised of two groups of securities, each group being listed alphabetically. The first group (beginning with “35,000 Shares Allied Stores Corp. 5% Cumulative Preferred” and ending with “75,000 Shares Youngstown Sheet & *808 Tube Co. Common”) consisted of those securities which, in the opinion of responsible officials of the British Treasury, were at the tune of the preparation of the schedules and the loan agreement owned by the British Treasury, having been previously acquired under Acquisition of Securities Orders. The second group in Schedule B-3 (beginning with “$2,750,-000 American & Foreign Power Co. Inc. 5% Debentures 1st March, 2030” and ending with “$1,974,000 Virginian Corp. 5% Collateral Trust Serial Notes £M’ 1st January, 1952”) consisted of those securities which, in the opinion of responsible officials of the British Treasury, were at the time of the preparation of the schedules and the loan agreement privately owned and had to be placed at the disposal of the British Treasury under the terms of The U. S. A. Securities (Placing at Treasury Disposal) Order, 1941, when issued (see finding 19). Some 12,200 shares of preferred stock and 26,400 shares of common stock in W. R. Grace & Company, including the Grace shares involved in this case, were listed in the second group.
17. The loan agreement of July 21,1941 provided in part for the passage in Great Britain of enabling legislation. This enabling legislation was enacted on July 29, 1941 as the Financial Powers (U. S. A. Securities) Act, 1941. The act provided in pertinent part as follows:
WHEREAS by an agreement * * * dated the twenty-first day of July, nineteen hundred and forty-one, * * * provision was made for a loan * * * subject to * * * securing the loan by pledge of securities of corporations incorporated under the laws of the United States of America * * *:

%

1. — (I) The Treasury may exercise such powers as appear to them necessary or expedient for the purpose of enabling the Agreement to be carried out, and. in particular * * *
(a) may require securities and income and other payments arising therefrom, and income from such branches as aforesaid, to be placed at the disposal of the Treasury;
(5) may require, prohibit or restrict the doing of any acts and the execution of any documents.
*809 (2)Any requirements, prohibitions or1 restrictions which it appears to the Treasury to be necessary or expedient to impose for the purpose aforesaid shall be prescribed by regulations made by them * * *.
2. — (I) Where any security has been. placed at the disposal of the Treasury by virtue of this Act, it shall be released by the Treasury as soon as may be after they have satisfied themselves, at any time while it is under their control, that it is no longer necessary or expedient for the purposes of the Agreement that they should retain control thereof:
Provided that—
(a) the Treasury may, if at any time it appears to them necessary or expedient so to do for the purposes of the Agreement, by order made as respects any class of securities or by direction given as respects any particular securities, declare that the right to release conferred by this subsection shall be extinguished in the case of the securities to which the order or direction relates;
(&) if any security is so dealt with in pursuance of the Agreement as to prevent the Treasury regaining control thereof under the Agreement, the right to the release of that security shall be extinguished.
(2) If at any time the right to the release of any security is extinguished, the Treasury shall as soon as may be thereafter pay in respect of the security such sum in sterling as they may determine, being a sum which in their opinion is not less than the market value thereof at that time:
$ $ $ * $
(3) Where—
(a) any security has been placed at the disposal of the Treasury by virtue of this Act, and any income or other payment arising therefrom before the release of the security, or the extinguishment of the right to the release thereof, is applied in pursuance of the Agreement; or
(b) any income arising from any such branch of an insurance company as aforesaid is so applied,
the Treasury shall, as soon as may be after the income or payment is so applied, pay in respect thereof such sum as appears to them to have been the sterling equivalent of the income or payment at the time when it arose.
(4) On the placing at the disposal of the Treasury of *810 any security, any right conferred by this section to release or payment in respect of the security, or to payment in respect of any income or other payment arising therefrom, shall vest in the person who, immediately before the placing thereof at the disposal of the Treasury, was entitled (whether as bailee or otherwise) to possession of the documents of title to the security, and, on the placing at the disposal of the Treasury of any income from such a branch as aforesaid, any right to payment in respect of the income shall vest in the person who, immediately before the placing thereof at the disposal of the Treasury, was entitled to receive income arising from that branch.
$ $ $ ‡ #
(8) Any right conferred by this section to the release of a security of any description may be satisfied by the release of any security of that description, and any such right to the release of a security may be satisfied by the release of any security substituted therefor by the exercise of any right of exchange or conversion or any similar right attaching to the security.
$ $ ‡ #
18. On July 29, 1941, The Financial Powers (U. S. A. Securities) Begulations, 1941, were promulgated. These regulations provided in part that:
1. — (I) The Treasury may, if and in so far as they are of opinion that it is necessary or expedient to do so for the purpose of carrying out an Agreement * * * by an order made generally with respect to any description of securities specified in the order (being securities issued by corporations incorporated under the laws of the United States of America or one or more of the States thereof) or by a direction given with respect to any particular securities (being such securities as aforesaid) require that any person who is an owner of any security specified in the order or direction shall, so far as it is in his power—
(a) place the security at the disposal of the Treasury;
(&) execute all such documents and do all such acts as may be necessary, or as the Treasury or the Bank of England on their behalf may direct, for the purpose of securing—
(i) that the security and any document of title relating thereto will be delivered to the Treasury or as they may direct, and in the case of any registered or inscribed security, that the security is so delivered m a *811 form, which will enable the Treasury to dispose of it for all the interest of which that person is competent to dispose;
(ii) that any dividends or interest on or other payments in respect of the security becoming payable on or after the date of the making of the order or the giving of the direction will be paid to the Treasury or as they may direct; and
(iii) that the voting power in respect of the security will, on and after the making of the order or the giving of the direction, be exercisable in accordance with any requirements of the Treasury.
(2) Where an order is made or a direction is given under the last preceding paragraph with respect to any security, no person shall, except with permission granted by or on behalf of the Treasury, sell transfer or do anything which involves the creation of a charge on, or affects his rights or powers in relation to, that security. [Emphasis supplied.]
19. Pursuant to the regulations mentioned in finding 18, an order designated as The TJ. S. A. Securities (Placing at Treasury Disposal) Order, 1941, was issued on August 5, 1941. Paragraph 1 of this order provided in part that:
Any person who is an owner of any security of the descriptions mentioned in the Schedule of this Order, being a security in respect of which a return has been made to the Bank of England under paragraph 2 of the Securities (Restrictions and Returns) Order 1989 * * * shall place the security at the disposal of the Treasury * * *.
There was appended to this order a schedule listing the securities of 17 companies, among which was W. R. Grace & Company.
20. On August 6,1941, the Bank of England issued Form RFC 2, entitled “Securities Placed at the Disposal of H. M. Treasury. Notice to Banks and Stockbrokers.” It contained procedural instructions with respect to delivery of the securities to the Bank of England.
21. On August 6, 1941, the Bank of England addressed to Coutts & Company a letter which read as follows:
I write to inform you that your holding of the above mentioned security is affected by the U. S. A. Securities (Placing at Treasury Disposal) Order, 1941, in con *812 nection with which II. M. Treasury have made the following announcement:
“The Treasury announce that an Order has been made specifying certain American securities which the owners are required to place at the disposal of the Treasury for the purpose of being used as part of the collateral security for the loan of $425 million to be obtained from the Reconstruction Finance Corporation.
_ “The owners are required under Treasury Directions published in the Gazette to deliver the documents of title, accompanied by the appropriate Lodgment Form. This should be done through a bank or stockbroker.
“Receipts will be issued for the securities, and should be carefully preserved. Production of the Receipts will be necessary in connection with any change of title to the securities, and to procure their eventual return to the holders.
“The securities will be released when no longer required to serve as collateral, unless the Treasury should decide that it is necessary to acquire them outright, or in the event of default on the loan, in which case payment for them would be made in sterling on the basis of the market price at the time. Meanwhile, the sterling equivalent of the dividends, etc., will be paid in accordance with the instructions given to the Bank of England on the Lodgment Form.”
It is recommended that a bank or stockbroker be approached for advice as to the completion of the necessary formalities and of the Lodgment Forms (RFC 1) which are enclosed.
Yours faithfully,
K. O. Peppiatt,
Chief Cashier.
The communication quoted in this finding was understood by Coutts & Company as referring to the Grace shares.
22. Pursuant to the letter quoted in finding 21, Coutts & Company on August 7,1941 filled out the required lodgment forms (RFC 1, Securities Placed at the Disposal of H. M. Treasury) with respect to the several categories of the Grace shares, i. e., 1,000 shares of 8% Cumulative Class “A” Preferred Stock, 439 shares of 8% Non-Cumulative Class “B” Preferred Stock, 687 shares of 6% Cumulative Preferred *813 Stock, and 4,317 shares of Common Stock. Coutts & Company requested on these forms that the formal receipts be issued to Abchurch Nominees, Limited, 15 Lombard Street, London (as the pertinent instructions stated that receipts could not be issued in the name of a firm as such, and recommended that arrangements be made for the issuance of receipts in the name of a corporate body). The lodgment forms were submitted to the Bank of England.
23. On August 14,1941, the Bank of England, as agent for the British Treasury, issued temporary receipts, styled “Call Tickets”, with respect to the lodgment forms covering the Grace shares. Each of these “Call Tickets” read as follows:
RECEIVED a Form RFC 1 in respect of Securities to be deposited with The Agency, Bank of Montreal, New York.
[Sgd.]-
This Call Ticket should be presented on ADVICE to be exchanged for a FORMAL RECEIPT for the securities.
24. Pursuant to the instructions contained in the lodgment forms prepared by Coutts & Company, formal receipts dated September 19, 1941 were issued by the Bank of England to Abchurch Nominees, Limited, of 15 Lombard Street, London, acknowledging the receipt of a total of 6,443 shares of the capital stock of W. R. Grace & Company, consisting of 2,126 shares of preferred stock and 4,317 shares of common stock. Each of these formal receipts read as follows:
RECEIVED from Abchurch Nominees Limited, of 15, Lombard Street, London, E. C. 3._
the following security which has been placed at the disposal of H. M. Treasury in accordance with am, Order made or Directions given in pursuance of the Financial Powers (U. S. A. Securities) Act, and of the Financial Powers (U. S. A. Securities) Regulations, 1941, made thereunder.
_[description of security] Bank of England, this 19th day of September, 1941
[Sgd.]-.

Chief Cashier.

The Security and this Receipt are subject to the provisions of the Financial Powers (U. S. A. Securities) *814 Act, 1941, and Regulations, Orders and Directions issued thereunder.
NOTICE may at any time be given to the registered holders named above requiring the surrender of this RECEIPT to the Bank of England in exchange for the security or other security as provided by Section 2 (8) of the said Act.
This Receipt must be surrendered before any transaction affecting the security will be authorized.
25. On September 22,1941, the Bank of Montreal, then in possession of the Grace shares for the account of the British Treasury, caused such shares, theretofore registered in the name of the decedent, to be transferred into the name of Corey & Company. Corey & Company is the Nominee for the Bank of Montreal.
26. The Grace shares were again endorsed in blank by Corey & Company; and, in this form, they were delivered as collateral for the Reconstruction Finance Corporation loan. Said shares were so registered and so held on March 12,1946, the date of the decedent’s death.
27. On November 23,1943, the authorized common stock of W. R. Grace & Company was increased, and two new shares were issued in exchange for each share then outstanding. A formal receipt dated December 28, 1943 was issued by the Bank of England to Abchurch Nominees, Limited, acknowledging the receipt of 8,634 shares of common stock.
28. On December 26,1945, the authorized common stock of W. R. Grace & Company was again increased, and three new shares were issued in exchange for each two shares outstanding. A formal receipt dated December 27, 1945 was issued by the Bank of England to Abchurch Nominees, Limited, acknowledging the receipt of 12,951 shares of common stock.
29. After the decedent’s death on March 12, 1946, the National Provincial Bank Limited, as executor, executed a Form 706NA (Non-Resident Alien Estate Tax Return) ; and the City Bank Farmers Trust Company, as ancillary executor, filed said return with the Collector of Internal Revenue for the Second District of New York on or about June 10, 1947, which was within the time prescribed by law. With the filing of the return, payment was made in the amount *815 of $668,219.75, representing the tax shown in the return as due.
30. Items 1-5, inclusive, of Schedule A of the Form 706NA mentioned in finding 29 listed the Grace shares as includible in the Grace Estate, said securities having a value of $1,792,455 on March 12, 1947, the optional valuation date. The Grace shares were described in the return as follows:
1. 687 shs. W. R. Grace & Co. 6% Cum. Pfd. $100 par
2. 1000 shs. W. R. Grace & Co. 8% Cum. Class A Pfd. $100 par
3. 439 shs. W. R. Grace & Co. 8% Non-Cum. Class B Pfd. $100 par
4 — 5. 12,951 shs. W. R. Grace & Co. Common, no par
Of the total amount of $668,219.75 paid as estate tax (see finding 29), the sum of $666,762.75 was attributable to the Grace shares.
31. Item 6 of Schedule A of the return mentioned in finding 29 listed 115 shares of Ingersoll-Rand 6% Preferred Stock, at a valuation on the optional date of $20,700. The portion of the total estate tax payment attributable to this stock amounted to $1,457. The Ingersoll-Rand stock is conceded by the plaintiff to have been properly includible in the gross estate of the decedent.
32. The following steps were taken in connection with the payment of the estate tax mentioned in findings 29, 30, and 31:
(a) Representatives of the decedent’s estate applied to the Bank of England for the necessary dollars with which to pay the United States estate tax.
(b) On June 2, 1947, representatives of decedent’s estate filed with the Commissioner of Internal Revenue, in the form of an affidavit executed by Charles C. Parlin, Esq., an application for the release of the United States estate tax lien on the Grace shares.
(c) The consent of the Reconstruction Finance Corporation to the sale of the Grace shares was sought.
(d) The British Treasury made available to the decedent’s estate, against payment in sterling, sufficient dollars to pay the United States estate tax.
*816 (e) With, the dollars so advanced, the estate paid the United States estate tax, and the United States Treasury Department released the United States estate tax lien on the Grace shares.
(f) The Grace shares were sold on June 12, 1947 with the consent of the Reconstruction Finance Corporation, and the proceeds were applied by the Reconstruction Finance Corporation against its loan to the British Government.
(g) The Bank of England paid to the estate, in England, pounds sterling equivalent to the proceeds of the sale of the Grace shares.
33. On or about May 11, 1950, the City Bank Farmers Trust Company, as ancillary executor, timely filed with the Collector of Internal Revenue for the Second District of New York a claim for the refund of United States estate tax in the sum of $666,762.75, with interest thereon from the date of payment. The ground asserted in the claim was that the Grace shares were not subject to the United States estate tax because they were not “owned and held” by the decedent as of the date of his death, within the meaning of section 862 (a) of the Internal Revenue Code of 1939, which provided that:
Stock in a domestic corporation owned and held by a nonresident not a citizen of the United States shall be deemed property within the United States * * *.
34. On or about August 2, 1951, the Commissioner of Internal Revenue mailed to the City Bank Farmers Trust Company a letter disallowing the claim for refund in its entirety.
35. During 1939 and 1940, dividends on the Grace shares were paid (less withholdings to cover United States income taxes) to Coutts & Company for the account of the decedent; and during the first six months of 1941, dividends on such shares were paid (less amounts withheld to cover United States income taxes) to the Grace National Bank “a/c Coutts a/c Carlos A. Grace”.
36. From July 1, 1941 to June 12, 1947, when the Grace shares were sold, dividends on these shares were paid to the Reconstruction Finance Corporation, which applied such dividends to the service of the loan to the British Govern *817 ment, in accordance with the provisions of the loan agreement. The pounds sterling equivalent of the dividends, less United States income tax withheld and less British income tax withheld, was paid by the British Treasury to the account of the decedent, or to his estate after his death. The United States income tax on said dividends was reported by The Agency, Bank of Montreal, and certified to the Reconstruction Finance Corporation, which reimbursed the Bank of Montreal from the dividends received.
37. For each of the years 1941 through 1945, the decedent filed with the appropriate agency of the defendant a Nonresident Alien Income Tax Return, on which he reported the dividends on the Grace shares that had been placed at the disposal of the British Treasury, the pounds sterling equivalent of such dividends having been paid to the decedent by the British Treasury. For 1946, such a return was filed by the decedent’s executor.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover, of and from the United States the sum of six hundred sixty-six thousand seven hundred sixty-two dollars and seventy-five cents ($666,762.75), with interest as provided by law.

 In 1947, the provisions of law relating to the imposition by the united States of taxes on the estates of nonresident aliens were contained in sections 860-865 of the Internal Eevenne Code of 1939, as amended. The current provisions of law on this subject are found in sections 2101-2106 of the Internal Revenue Code of 1954.

 The preferred stock mentioned in this finding Is the preferred stock that Is referred to in finding 1. Due to increases in the authorized common stock of W. K. Grace & Company that were made in 1943 and 1945, the 4,317 shares of common stock mentioned in this finding ultimately became the 12,951 shares of common stock that are referred to in finding 1. (See findings 27 and 28.)